UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
GRAY, et al.,                 : 14-cv-02488-MKB-MDG
             Plaintiffs,      :
                              :
    - versus -                : U.S. Courthouse
                              : Brooklyn, New York
                              :
CITY OF NEW YORK, et al.,     : March 30, 2016
             Defendants       :
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
BEFORE THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**


**For the Plaintiff:**        **Michael O. Hueston, Esq.**
                              16 Court Street
                              Suite 3301
                              Brooklyn, NY 11241

                              **Richard J. Cardinale, Esq.**
                              The Law Firm of
                              Richard J. Cardinale
                              26 Court Street
                              Suite 1815
                              Brooklyn, NY 11242


**For the Defendant:**        **Paul Hasan Johnson, Esq.**
                              **Alan Scheiner, Esq.**
                              New York City Law Department
                              100 Church Street
                              New York, NY 10007


**Nonparty:**                 **Anthony L. Ricco, Esq.**
                              26 Vesey Street
                              New York, NY 10007

**Transcription Service:**    **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE COURT:  Gray v. City of New York, docket
2     number 14-cv-2488.
3          Will counsel appearing by telephone for this
4     discovery hearing please state their names for the
5     record?  For the plaintiffs?
6          MR. HUESTON:  Sure, your Honor, Michael Hueston
7     and Richard Cardinale for the plaintiffs.
8          MR. JOHNSON:  Paul Johnson and Alan Scheiner
9     for defendants.
10          THE COURT:  And I understand at the request of
11     the Court, Mr. Ricco is one the line, too.  Could you
12     state your name?
13          MR. RICCO:  Yes, I am, your Honor.  Good
14     afternoon.
15          Anthony Ricco on the line at the request of the
16     Court.
17          THE COURT:  And I do that -- we invited you to
18     participate because you're the attorney and the client
19     involved, of course, is not participating.  I guess he
20     was incarcerated for other matters unrelated to this
21     case.
22          But I've reviewed the papers and actually, I
23     think the decision is fairly straightforward.
24          MR. HUESTON:  Your Honor, we just want to say
25     we did try to serve papers on his previous counsel but we

3

Proceedings

1   weren't able to track down his current counsel.

2           THE COURT:  Okay.  I'm not sure it's necessary

3   at this juncture but let me proceed.  I think there are

4   two -- as a preliminary matter, the Court has to decide

5   whether or not there was any attorney-client privilege

6   that was established and certainly the Second Circuit has

7   made clear, the burden of establishing the existence of

8   the attorney-client privilege rests with the party

9   asserting it and among the cases, I cite In re Grand Jury

10  Proceedings, 218 F.3d at -- 219 F.3d at 182.

11          And I think it's equally clear that preliminary

12  discussions between a witness and an attorney can be

13  privileged, even if the witness does not retain an

14  attorney as numerous courts have recognized, including

15  United States v. DeBerry (ph.), a 1995 case from the

16  Southern District.  And the Second Circuit noted in

17  United States v. Dennis, 843 F.2d at 657, the key to

18  whether or not the relationship existed is the intent of

19  the client and whether he reasonably understood the

20  conference to be confidential.

21          Now, I mean based on certainly the testimony of

22  Mr. Ricco, I think it's clear that although he was acting

23  in a pro bono capacity, he was requested by Mr. Fraser to

24  represent him as an attorney.  So I find that there was

25  an attorney-client privilege that was ultimately

4

Proceedings

1   established.

2            And communications leading to the retention,

3   even though the retention of Mr. Ricco did not occur

4   under normal circumstances where the client seeks

5   counsel, I think doesn't change the analysis or my

6   conclusion at all.

7            However, as the defendants argued in their

8   initial papers that there may be a waiver here because

9   the communications in the presence of a third-party are

10  not privileged.  And, you know, the confidence that

11  courts expect in discussions between an attorney and a

12  client has to be preserved and so unless the confidential

13  statements are maintained, there -- the privilege can be

14  pierced as the Second Circuit recognized in United States

15  v. Mejia, 655 F.3d at 134.

16           And the testimony of Mr. Ricco makes clear and

17  I don't think plaintiff disputes that but the

18  investigator retained by plaintiff's counsel was present

19  throughout the interview between Mr. Ricco and Mr.

20  Fraser.

21           I view Mr. Hinckson (ph.) as a --

22           MR. RICCO:  Judge, that's not a true statement.

23           THE COURT:  What (indiscernible)?  Okay.

24           MR. RICCO:  That's what the City said in its

25  papers but that's not a true statement.

5

Proceedings

1          THE COURT:  Isn't that what you said in your

2    deposition testimony?

3          MR. RICCO:  Mr. Hinckson, the statement at the

4    -- that took place at the apartment where he is

5    discussing with me what happened, Mr. Hinckson is in the

6    apartment but he is not in the living room where the

7    conversation is taking place between myself, and Jaquan

8    Fraser and his grandmother.  Now his grandmother is

9    certainly present, your Honor.

10         THE COURT:  Yes.  Okay.  I misunderstood.  I

11   guess I will -- let me just flip through the pages.  I

12   guess it's not made clear actually.

13         MR. RICCO:  I think that's a fair statement,

14   your Honor, because, you know, those are the questions

15   that the City posed and they very -- their letter that

16   they wrote to you is not only filled with inaccuracies as

17   -- is right out, saying things that just weren't said.

18         And it's very simple, Judge, Mr. Hinckson

19   definitely drove me there.  He was at the apartment as

20   were two other young people, whose names I don't recall,

21   but the conversations between myself and Jaquan Fraser

22   and his grandmother took place in the living room area.

23   Mr. Hinckson wasn't sitting in during that part of the

24   conversation.

25         And they asked me questions about the trip

6

Proceedings

1   back, because we did go back and they asked me questions
2   about picking him up at school, which Mr. Hinckson did
3   and they specifically asked did we discuss anything when
4   we picked him up from school and the answer to that was
5   no, because we didn't.
6           THE COURT:  Did you have discussions in the car
7   after the first interview with Mr. Fraser?
8           MR. RICCO:  Yes, Judge, but not about anything
9   that Mr. Fraser during the interview.
10          THE COURT:  Mr. Johnson?  Hello?
11          MR. JOHNSON:  I'm here, your Honor.  Sorry, I
12  was just getting my paperwork out on that.  And it was
13  the City's position that Hinckson was present when Ricco
14  spoke with Fraser's grandmother and that the --
15          THE COURT:  Well, where is that made clear?  I
16  had assumed that was the case just from what -- from the
17  lack of any statement otherwise.  We know that Mr.
18  Hinckson drove Mr. Ricco to the Fraser -- to Mr. Fraser's
19  apartment and he drove him back.
20          Mr. Ricco is now clarifying and said that the
21  interview took place in the living room outside of the
22  presence of Mr. Hinckson and the two young people whose
23  names he doesn't remember.
24          MR. SCHEINER:  You know, this is Alan Scheiner.
25  I was also present at the (indiscernible).

7

Proceedings

1          THE COURT:  I'm sorry, I can barely hear you.

2          MR. SCHEINER:  This is Alan Scheiner, your

3    Honor.  I was also present at the deposition and your

4    Honor has the full transcript.  Certainly, our

5    interpretation or rather our understanding of what

6    (indiscernible) depositions is exactly as we described it

7    and I gather from your Honor's comments (indiscernible).

8          I think that what Mr. -- we would think

9    constitutes a change to the deposition testimony but it

10   also raises further questions such as where was Mr.

11   Hinckson during this conversation?  In some apartments,

12   there's really no difference between a living room and a

13   dining room.  They're right next to each other.  They're

14   open to each other.

15          So I think it raises the question well, if he

16   was in the living room, where was he and who was he with

17   and what was he doing?

18          MR. RICCO:  I can answer that right now.

19          MR. SCHEINER:  (Indiscernible) appear to me --

20   I'm sorry, I am speaking (indiscernible) -- that, you

21   know, we can't really be sure from Mr. Ricco's amendment

22   to the deposition whether there was confidentiality or

23   not.

24          THE COURT:  I --

25          MR. SCHEINER:  So I think we should hear more

8

Proceedings

1  about that.

2          MR. RICCO:  Well, Judge, I would go to page 28

3  of the deposition where he asks me the question and I

4  answered it and he didn't bother to answer -- any follow-

5  up questions or anything about that.  If he was really

6  interested in that, he would have asked it.

7          MR. SCHEINER:  Well, your Honor, we didn't ask

8  because we thought that Mr. Ricco was telling us that

9  (indiscernible) conversation.

10          MR. RICCO:  Judge, I'm speaking now.

11          THE COURT:  As to --

12          MR. RICCO:  Judge, I would say this --

13          THE COURT:  Stop, stop, Mr. Ricco.

14          MR. RICCO:  Yes.  Sure.

15          THE COURT:  It is not clear and there's no

16  specific question on whether or not of where Mr. Hinckson

17  was.  Mr. Ricco's testimony on page 28, as he pointed to,

18  was his grandmother was present for that meeting.  And

19  there's a question about Mr. Hinckson.  There's no

20  question as to where Mr. Hinckson was.  If you want to

21  know, I'll hear Mr. Ricco now.  Go ahead, Mr. Ricco.

22          MR. RICCO:  Judge, Mr. Hinckson was in the

23  dining room area in the accompaniment of the other two

24  people, the other two young people who were present in

25  the apartment and they were engaged in a conversation

9

Proceedings

1  when I was sitting down talking to Mr. Fraser and his

2  grandmother in the living room area.

3         The two areas were divided as apartments are

4  divided.  I can't tell the Court that a door was shut.  I

5  am not going to say that because I don't remember that.

6  But we were in two different areas of the apartment and I

7  specifically had those conversations outside of the

8  presence of Mr. Hinckson and the other two individuals

9  because of the attorney-client privilege.  And I took

10 precautions to protect it.

11        MR. SCHEINER:  Your Honor?

12        THE COURT:  Okay.

13        MR. SCHEINER:  If I may?

14        THE COURT:  Yes.  This is Mr. Scheiner?

15        MR. SCHEINER:  Scheiner.  Yeah, I am just not

16 clear from what Mr. Ricco said when he said that he

17 doesn't know if his door was shut but it's not clear even

18 if there was a wall between the living room.  As I

19 indicated before, not every apartment does not have a

20 wall between them.  I --

21        THE COURT:  Okay.

22        MR. SCHEINER:  -- (indiscernible) --

23        THE COURT:  Wait.  Stop.

24        MR. SCHEINER:  -- (indiscernible) said --

25        THE COURT:  Mr. Scheiner?

10

Proceedings

1          MR. SCHEINER:  -- for as much as we

2    (indiscernible) take it --

3          THE COURT:  Stop.

4          MR. SCHEINER:  Yes.

5          THE COURT:  Was the kitchen in a separate room

6    and was there a wall separating the kitchen area from the

7    living room area, Mr. Ricco?

8          MR. RICCO:  Yes, your Honor.  I specifically

9    recall that there was a partition up between the area

10   that I was discussing the initial part of the case with

11   discussions between Jaquan Fraser and his grandmother.  I

12   specifically remember that there was a partition dividing

13   that off.  That we were in a room by ourselves during

14   this conversation and so, your Honor, I don't remember

15   the exact configurations of the apartment.  I think when

16   you walk in, you go into a kitchen area and then you go

17   into this main living room area and there were two

18   bedrooms or maybe one bedroom off to the side.

19          Ms. -- Jaquan Fraser and his grandmother and I

20   discussed the representation of him in a separate-off

21   area of that apartment, which I describe as a living room

22   area.  And Mr. Hinckson was with the two other

23   individuals in a walled-off separate area.

24          THE COURT:  But there was an opening between

25   the two areas.

Transcriptions Plus II, Inc.

11

Proceedings

1      MR. RICCO:  Yes, you can -- because --

2      THE COURT:  Was there a door?

3      MR. RICCO:  Yeah, it was a doorway.  I mean,

4  you had to be able to walk in and out, Judge.

5      THE COURT:  But you're not -- you can't

6  remember whether or not the door was shut?

7      MR. RICCO:  No, I can't remember if the door

8  was shut but I do know that I felt confident that we had

9  privacy and the reason why we were meeting in that way

10  was so that he could have privacy and that was explained

11  to him.

12      MR. SCHEINER:  Your Honor, if I could point to

13  something in the transcript that, you know, I think the

14  (indiscernible) of the original testimony that was

15  received.  It's on page 34 -- 35 to 36, your Honor, where

16  we ask Mr. Ricco whether he discussed with Mr. Hinckson

17  the meeting that had occurred with Mr. Fraser and I am

18  going to read from line 18 to line 2 of the following

19  page or rather line 7 of the following page.  Mr. Ricco

20  said:

21      "Answer:  I think we generally discussed the

22  kids in that neighborhood, familiarity with the

23  neighborhood.  It wasn't sort of like an ah-hah moment.

24  We generally talked about the (indiscernible) can't

25  remember any specifics like we discussed, for example,

12

Proceedings

1    Jaquan said something and we discussed that in the car
2    (indiscernible).   Not necessarily.  I don't think there
3    was anything said at the meeting that sort of shocked or
4    surprised Mr. Hinckson.  We talked generally about, you
5    know, the case and we also talked about combined belief
6    that it was going to be difficult to get him to
7    participate.  We thought that he was just very
8    disillusioned and that turned out to be true."
9          So, your Honor, I want to point out that what
10   Mr. Ricco said at the deposition was I don't think there
11   was anything said at the meeting that sort of shocked or
12   surprised Mr. Hinckson.  It really --
13          THE COURT:  Mr. Scheiner?
14          MR. SCHEINER:  -- is difficult --
15          THE COURT:  Mr. Scheiner?
16          MR. SCHEINER:  Yes.
17          THE COURT:  You had the opportunity to follow-
18   up and question him for -- questioning him further on
19   that point.  And I don't quite understand why your
20   decision or failure to follow-up with further questions
21   about that discussion between Mr. Ricco and Mr. Hinckson
22   is the basis for reopening Mr. Ricco's deposition.
23          MR. SCHEINER:  Your Honor, my point is that Mr.
24   Ricco testified that Mr. Hinckson heard whatever Mr.
25   Fraser had to say and was not shocked or surprised by it.

Proceedings

1   That's --

2           MR. RICCO:  Judge, I didn't say that at all.

3           MR. SCHEINER:  -- (indiscernible) meaning of

4   his testimony that I just read.

5           MR. RICCO:  That doesn't say that.

6           MR. SCHEINER:  (Indiscernible) said that, "I

7   don't think there was anything said at (indiscernible),"

8   meaning the meeting with Mr. Fraser, "that sort of

9   shocked or surprised Mr. Hinckson."  To me, that's a

10  statement that Mr. Hinckson heard the meeting and he

11  wasn't shocked or surprised by it.

12          THE COURT:  No, I think this is taken out of

13  contexts.  You're talking about a discussion between Mr.

14  Ricco and Mr. Fraser after the meeting.  So you drove

15  back with Mr. Hinckson and did you discuss the meeting

16  with him.  And he said -- you asked him again and I think

17  we generally discussed the kids in the neighborhood and

18  so forth.

19          So I don't know how you can infer from that the

20  witness' answer in the context of the questioning that

21  Mr. Hinckson was at the meeting between Mr. Ricco and

22  Fraser.

23          MR. SCHEINER:  Your Honor, for the -- just I

24  will note it again for the record.  Page 35, line 25

25  through page 36, line 2.  I think it says exactly that.

14

Proceedings

1  It says Mr. Hinckson heard the meeting and he wasn't

2  shocked or surprised by it.

3           MR. HUESTON:  Your Honor, this is Michael

4  Hueston.  The only thing I would add, really I do think

5  that this is being taken out of context because it seems

6  clear just from my reading of it that is Mr. Ricco was

7  saying it was sort of like -- excuse me, he said, "I

8  can't remember any specifics."  That's on line 22.  And

9  then he gives examples.  And I think that's a fair read

10 of it and I do think -- you know, I don't think that's a

11 fair characterization and I did want to state that.

12           And then in Mr. Ricco seems on page 36, lines

13 3, really gets to the heart of what they're talking about

14 which Mr. Scheiner is not focused on, we talked generally

15 about, you know, the case.  We talked about our combined

16 belief that it may be difficult to get him to

17 participate.  And then goes on and it ends.

18           So that's it, your Honor.  Thank you.

19           THE COURT:  It would have been more helpful for

20 the -- in the interest of clarity that there were more

21 questions regarding what the statement meant but I don't

22 think that the -- I don't think from the context of the

23 questioning that Mr. Ricco was saying Hinckson was at the

24 meeting.

25           There is certainly a question whether or not --

Proceedings

1   in the back of my mind but, you know, I don't understand

2   why that wasn't explored during the deposition of Mr.

3   Ricco.  There's a question that well, what general things

4   did you discuss with Mr. Hinckson that he can't remember

5   the specifics and did you talk about was there a

6   discussion regarding what Jaquan said as to what he saw.

7   Anyway, you didn't ask that.

8            MR. SCHEINER:  Would you like us to respond

9   or --

10            THE COURT:  Go ahead.

11            MR. SCHEINER:  I'm not clear whether you want

12   us to (indiscernible) or explain.

13            THE COURT:  Explain what?  I mean, I will hear

14   you.

15            MR. SCHEINER:  Yeah, I mean the answer to why

16   you didn't ask that is because we were both there and we

17   both believed he had told us that Mr. Hinckson -- the

18   investigator was present during the conversation and here

19   he was just saying that again, that he was there and he

20   wasn't surprised by what was said.  That's how we read

21   it.  We didn't think any more questions were needed.

22            THE COURT:  Well, you should have asked him,

23   was Mr. Hinckson in the room with you when you

24   interviewed Mr. Fraser.  Why didn't you ask that?  You

25   know, it's not -- it definitely isn't clear from the

16

Proceedings

1  beginning of the -- earlier in the deposition, that

2  wasn't even the case.  Yes, Hinckson drove him there and

3  yes, it's not unfair to assume to assume he might have

4  been there present but now that Mr. Ricco has clarified,

5  it certainly would have made sense for you to have

6  clarified during the deposition.

7          MR. SCHEINER:  Well, your Honor, I will also

8  note another question I can anticipate your saying.  It's

9  not the question you think we should have asked but it's

10 the other question that I think bears on this.  On page

11 34, line 15, (indiscernible) asked:

12          "Question:  Did you see Mr. Hinckson take any

13 notes while at Mr. Fraser's apartment that day?"

14          And the answer was:

15          "Answer:  No, and it is not that he didn't take

16 notes because someone asked him not to, but I remember

17 the meeting very well.  I remember the apartment, the

18 meeting.  He wasn't taking any notes that day.  It wasn't

19 that kind of meeting."

20          So I don't think that answer makes any sense if

21 Mr. Hinckson wasn't at the meeting.  He's talking about a

22 meeting and the question is were there any notes taken

23 and he said it wasn't that kind of meeting.

24          MR. RICCO:  No, that's not what the question

25 says.  The question says, "Did he take any notes when he

17

Proceedings

1   was at the apartment."

2           MR. SCHEINER:  And I'm talking about the answer

3   which refers to the meeting.  So, it's just another

4   example of why I think the fair inference is that he was

5   at the meeting.  But I understand your Honor saying that

6   the burden was on us to ask the question because you feel

7   that the statements were not clear enough.  Our view at

8   the time was that they were clear enough.  That's why we

9   didn't ask any additional questions because we thought it

10  was clear that he was present.  And all I can do is tell

11  you why and point to these sections of the transcript

12  that I think support that -- our inference that he was

13  present.

14          And I also feel that if he's in an adjoining

15  room with an open door, that is not necessarily

16  confidential.  When you meet with a client in your

17  office, even in your own law office, typically you close

18  the door.  That's standard practice.  I don't think it

19  is confidential if you have people in an adjoining room

20  and an open door.

21          MR. RICCO:  I think the issue is whether or not

22  the person who is being interviewed believes that they

23  have an expectation of what they are saying is in

24  confidence and that measures are taken to assure that.

25          And that's what happened here.  That's simply

18

Proceedings

1   what happened here, your Honor.  The City is making a

2   mountain out of a molehill.  You know, I took steps to

3   protect this young man's rights and interests, given the

4   circumstances that were there.  I believed that they were

5   protected.  His grandmother -- they felt very

6   comfortable.  We -- you know, it was a comfortable

7   setting.  We had a --

8           And, your Honor, actually this was a very brief

9   conversation about the case itself.  Most of the time was

10  spent talking about his background, his grandmother's

11  background, school, taking responsibility, things of that

12  nature.  And I do know that steps were taken to protect

13  confidentiality and to see to it that he was represented.

14          And, you know, counsel could talk about what's

15  done in an office and what he does and doesn't do, it

16  just -- that's not what this situation was, Judge.  And

17  if I thought otherwise, your Honor, I would say it.

18          THE COURT:  When you testified he wasn't taking

19  any notes that day --

20          MR. RICCO:  Yes.

21          THE COURT:  -- was that because he wasn't in

22  the room to take notes, is that what you meant?

23          MR. RICCO:  That's right, Judge.  He wasn't in

24  the room to take notes.  You know, I see now that the

25  question was was he taking notes in the apartment.  You

19

Proceedings

1  know, did I see him taking notes in the apartment.  Mr.

2  Hinckson did not have any writing utensils with him.  He

3  didn't have a pad, a pen or anything.  And he was not

4  sitting in the room where the conversation took place.

5           THE COURT:  Okay.

6           MR. SCHEINER:  Your Honor, I also want to note

7  that, if I may, this is Alan Scheiner, that although you

8  ruled that you felt that the attorney client relationship

9  would extend to this conversation if it were

10  confidential, as you know, it was Mr. Ricco who initiated

11  this conversation and I do think that there's a question

12  as to when a person who has not sought out legal advice,

13  would all of the sudden have an expectation that they

14  have an attorney-client privilege when they didn't even

15  go out looking for a lawyer.  I don't think that has been

16  established.

17           THE COURT:  We actually took a look at the

18  disciplinary rule on solicitation and certainly it is

19  permissible when an attorney is acting in a pro bono

20  basis.  I don't think there was an assertion of privilege

21  as to the conversations leading to the interview in the

22  living room and though certainly, the preliminary

23  discussions leading third-party the establishment of an

24  attorney-client relationship could also be a basis.

25           But, yes, as I noted, even though the

20

Proceedings

1    relationship was precipitated by Mr. Ricco's appearance

2    at the apartment it doesn't mean that a relationship

3    could not have been established.

4                (Court and clerk confer)

5                THE COURT:  Mr. Ricco did talk about explaining

6    that he was -- what his role was to represent him and he

7    had asked them if he wanted -- he asked Mr. Fraser and

8    his grandmother whether or not he wanted Mr. Ricco to

9    represent Mr. Fraser.

10               MR. SCHEINER:  Well, I think, no, your Honor,

11   that question -- again, my understanding, maybe I misread

12   the deposition this way, too is that's the end of the

13   conversation.  So, you know --

14               MR. RICCO:  No, you asked that question in the

15   deposition.

16               MR. SCHEINER:  And we know when Mr. Ricco --

17   when Mr. Fraser first had this belief that he was having

18   this confidential discussion with someone to be his

19   lawyer rather than a discussion about what happened on

20   the night that he (indiscernible).

21               THE COURT:  Well, Mr. Ricco just explained and

22   he stated that he explained to Mr. Fraser why he was

23   there.  And I can't put my hands on the right line and

24   page, but Mr. Ricco did confirm that he had asked whether

25   or not they wanted him to represent Mr. Fraser and the

21

Proceedings

1   answer was affirmative.

2         I don't know what else -- yes, he -- this is on

3   page 28.  "They agreed they wanted representation."  Once

4   that occurred, I don't think there's any serious issue as

5   to the establishment of attorney-client relationship.

6   And my -- as I said initially, my concern was whether or

7   not that privilege was waived by the presence of Mr.

8   Hinckson and now that this has been -- plaintiff's

9   counsel has pointed out and Mr. Ricco has elaborated

10  further, it does appear that there's no clear evidence

11  that Mr. Hinckson was in the room at the meeting.  There

12  was no specific question about that.

13        So as far as I am concerned, there was a

14  privilege and the discussions at the meeting between the

15  -- the discussion at the meeting between Mr. Ricco, Mr.

16  Fraser and Mr. Fraser's grandmother would be protected by

17  the attorney-client privilege.  I'm not persuaded that

18  there has been a showing that that privilege has been

19  waived.

20        MR. SCHEINER:  Will there be a written opinion,

21  your Honor?

22        THE COURT:  I wasn't intending to but I'll see

23  what I can do to whip up something.  I think you've had

24  the benefit of some additional statements by Mr. Ricco.

25  I will just confirm for the record that you made all of

22

Proceedings

1   these statements as an officer of the Court, Mr. Ricco?

2          MR. RICCO:  Yes, your Honor.

3          THE COURT:  Okay.  Before we go onto the next

4   issue, is there anything else we need to discuss about

5   this issue?

6          MR. SCHEINER:  No, your --

7          MR. HUESTON:  Not from plaintiffs, your Honor.

8          MR. SCHEINER:  No, your Honor.

9          THE COURT:  Okay.  You need not continue in

10  this conference if you don't want to, Mr. Ricco.

11         MR. RICCO:  Thank you very much, your Honor.  I

12  choose not to continue.

13         THE COURT:  Okay.  I wonder why?  Okay.  Go

14  ahead and disconnect and I will disconnect you too.

15         MR. RICCO:  All right.  Thank you very much,

16  your Honor.

17  (Mr. Ricco disconnects from conference.)

18         THE COURT:  Okay.

19         MR. HUESTON:  We're still here, your Honor.

20         THE COURT:  Yes, yes.  We have the --

21         MR. SCHEINER:  Sorry, I apologize, your Honor,

22  but maybe because we were temporarily unable to hear, we

23  didn't know there was another person on the line.  Who

24  was that?  Besides Mr. Ricco, was somebody else on the

25  line?

Proceedings

1          MR. HUESTON:  No, there's no one else on the

2    line.

3          MR. SCHEINER:  I'm sorry, I thought I heard

4    someone else.

5          THE COURT:  Oh, it might have been my other law

6    clerk coming in to tell me about another conference.

7          MR. SCHEINER:  Oh, okay.

8          THE COURT:  Anyway, on the request for

9    admissions, I don't have the benefit of the reports, so I

10   have no idea whether or not the requests at issue quote

11   the reports as the plaintiff claims and -- or whether or

12   not they are argumentative as the defendants argue.

13         There is certainly an obligation under Rule 36

14   to admit to the extent you can admit and so I will give

15   the defendants an opportunity to amend their responses to

16   admit whatever you think the reports say.

17         MR. SCHEINER:  But, your Honor, I think in our

18   response and if the plaintiffs had quoted them, you know,

19   we would admit (indiscernible) nothing is before us in

20   their request to be a quote.

21         MR. CARDINALE:  Well, everything but the DNA

22   report.

23         MR. SCHEINER:  (Indiscernible) is to prove out

24   the report, that's a different question and we

25   essentially admitted and am certainly happy to admit that

24

Proceedings

1  the reports are real and that they say what they say.  In

2  other words, they're authentic.

3        But that's not what they asked us.  You know,

4  so I think it's apparent that they're not quoting the

5  reports.  If they were, then we wouldn't have anything to

6  discuss.

7        MR. CARDINALE:  Your Honor, this is Richard

8  Cardinale.  Everything in terms of the DNA is taken

9  exactly from the reports.

10        THE COURT:  I don't know.  I mean, if you want

11  to send me the reports, tell me where they are.  I will

12  make a ruling but rather than doing that, I thought we

13  would just cut to the chase and get quotation marks put

14  either in the admissions or making the plaintiff re-

15  propound, you know, the request I -- we already have the

16  defendants agreeing to the existence of the reports and

17  stating that you stand by whatever the reports say.  Is

18  that correct?

19        MR. SCHEINER:  Yes, your Honor.  Yes.

20        THE COURT:  Okay.

21        MR. CARDINALE:  Your Honor, I put forward case

22  law stating that they can't just say the arrest and it

23  refers to the document -- the document (indiscernible).

24        THE COURT:  Yes, but if you want to say these

25  are direct quotes, put direct quotes or I will require

25

Proceedings

1   the defendants to respond by admitting as much as they

2   can.

3           MR. CARDINALE:  Well, some are direct quotes,

4   your Honor, some are not.

5           THE COURT:  I don't know.  It's -- that's fine.

6   If they are direct quotes, then put direct quotes on them

7   or to just point out to the defendants.

8           MR. CARDINALE:  Right, but not all of them are

9   direct quotes.

10          THE COURT:  Yes.

11          MR. CARDINALE:  Some of them just state

12  basically that no fingerprints were found.  Those aren't

13  direct quotes but I think the City has the obligation to

14  consult with the third parties as I indicated in my

15  letter and find out if that's what, in fact, the reports

16  say.  I mean, it's obvious that's what the report say.

17          So for them to say that we're arguing forensic

18  evidence or arguing points that they can't understand as

19  a lay person, that's just false.

20          THE COURT:  Look, I think what you could --

21          MR. CARDINALE:  (Indiscernible) file it with

22  the response.

23          THE COURT:  Wait, wait, wait.  You know, look,

24  you could have said like for instance, request number 3,

25  which is short and which is why I picked it, the -- if

26

Proceedings

1  you broke it into two parts, they testified the firearm

2  for palm prints and then the second part is that the

3  report states -- does not state that there were any palm

4  prints for Kimani Gray.

5           MR. HUESTON:  You would like us to serve new

6  requests, your Honor?

7           THE COURT:  You can do it either way or the

8  defendants can reformulate.  I think it's probably

9  simpler just to -- for you to re-propound since there's

10  still time left in discovery.  And we'll just shorten the

11  time, as long as you're basing your modified request on

12  these particular requests that are in dispute.

13           MR. CARDINALE:  But, your Honor, there are

14  certain requests that aren't (indiscernible) to in the

15  report.

16           THE COURT:  I'm sorry?

17           MR. CARDINALE:  There are certain requests that

18  are not direct quotes.  So what we do about those where

19  you basically can conclude by looking at the documents

20  that no fingerprints were recovered but it doesn't say

21  that.

22           THE COURT:  Well, I already gave you a --

23           MR. CARDINALE:  (Indiscernible).

24           THE COURT:  -- they did not find any

25  fingerprints.  The report does not mention that there

27

Proceedings

1    were any fingerprints found, right, or something.  The

2    report doesn't say that there were palm prints from

3    Kimani Gray found.

4               MR. CARDINALE:  That's correct.

5               THE COURT:  So it's --

6               MR. CARDINALE:  Do you want us to state it that

7    way, your Honor?

8               THE COURT:  Fine.

9               MR. HUESTON:  We'll put our heads to it.  This

10   is Mike Hueston.  We'll put our heads to it and well

11   propound -- we'll take the first crack at it and propound

12   them.

13              THE COURT:  Okay.  And then I am going to tell

14   the defendants they have an obligation to admit whatever

15   they can admit.

16              MR. SCHEINER:  (Indiscernible) denied to their

17   -- whatever their reports were taken from were just not

18   correct.  In other words, they --

19              THE COURT:  Okay.  That's fine.  Can I make a

20   suggestion?  Okay.  So plaintiffs, just give a roadmap of

21   the points -- I mean, of where -- whatever requests you

22   are propounding, cross-reference it to the page on the

23   reports.

24              MR. CARDINALE:  Okay, your Honor.

25              THE COURT:  Okay.  And I will shorten the

                        Proceedings

1   defendant's time to twenty days -- better make it twenty-

2   one, so we will -- it will end up on whatever day of the

3   week it is.  Okay?

4           Anything else?

5           MR. SCHEINER:  Yes, your Honor, there is

6   something that we raised with the plaintiffs earlier

7   today concerning some witnesses that I would like to

8   depose in light of Ms. King's (ph.) testimony.

9           Ms. King, as you know, (indiscernible) --

10          THE COURT:  I'm sorry, you just faded.  You

11  just faded.  Hello?

12          MR. SCHEINER:  Oh, I am sorry, your Honor.

13  Anyway, Ms. King said -- gave a statement, you know,

14  favorable to the plaintiff in the case during her

15  testimony and we, at least, view it as different than the

16  statement that she initially (indiscernible) after the

17  incident to IAB.

18          During the interim, after her first statement,

19  she spoke to several people.  One of them was Geraud

20  Gray, Kimani Gray's father.  He is an executor of the

21  estate but he is not a plaintiff in this case.  So we

22  attempted to depose him early in the case and found that

23  the draft that we had for him, which I think we got from

24  plaintiff's counsel, was not a correct address.  There

25  was nothing there, the process server told us.  And we

29

Proceedings

1   never (indiscernible) a new address for him.

2          But this testimony make his deposition more

3   important because he was the first person on the Gray

4   side to have contact with Ms. King and that occurred very

5   soon after the event.

6          They went together to Sanford Rubenstein's

7   office, your Honor, may know he is a lawyer who is

8   (indiscernible) cases, there was no testimony that he

9   represented anyone in connection with it, certainly not

10  -- the witness said he was not her lawyer.  But they went

11  there together and together they called the Daily News.

12         We would like to depose Mr. Rubenstein about

13  what the witness said to him and the circumstances, you

14  know, that brought her to his office.  Again, this was

15  shortly after the incident.

16         The third witness is somebody that Ms. King

17  identified as an acquaintance of her who put her in touch

18  with Geraud Gray.  We think it's likely that this

19  acquaintance discussed the incident with Ms. King, given

20  that.  And so, we would like to find and depose that

21  person.  I apologize that I don't have the name offhand

22  but she gave a name during the deposition.

23         So this is going to take a little bit of time,

24  I think not that much, but Mr. Rubenstein certainly is

25  available, I assume, (indiscernible) but the Geraud Gray,

Proceedings

1    we had difficulty.  As I said, we -- right now, we don't

2    have an address (indiscernible).  We think that because

3    he is an executor of the estate, that the plaintiff had

4    some obligation to produce him, he is essentially part of

5    the plaintiffs (indiscernible).  And at least, there

6    should be an explanation of why that's not possible.

7           But all this is to say, I don't know if the

8    plaintiff has an objection to these depositions but we're

9    going to need a little bit more time to make this happen

10   and I would get, you know, the three (indiscernible) to

11   allow it.

12          So the first question is can we have time to do

13   the deposition?  The second one is can the plaintiffs

14   produce Mr. Gray or his current location?

15   (Indiscernible) can't produce (indiscernible).

16          MR. CARDINALE:  Mike, do you want to speak as

17   to Mr. Gray?

18          MR. HUESTON:  I mean, your Honor, we told Mr.

19   Scheiner this and it has to be over a year, if my memory

20   serves me.  We don't represent Geraud Gray period.  The

21   address I gave him is the one that he provided to, I

22   guess the Surrogate's Court in terms of having letters of

23   administration.  That's all we have.  We don't represent

24   him.  We have no control over him.  And so they have what

25   we have.  They have the same ability to get an

Proceedings

1  investigator and try to find him.  We're under no

2  obligation to locate him and, you know, we've talked

3  about this.

4          You know, they've had really a very long period

5  of time to look into this issue and so, really we have

6  nothing further on that, your Honor.

7          THE COURT:  Does your client -- does Carol Gray

8  know his address for contact information?

9          MR. HUESTON:  I don't know that, your Honor.

10  And I would have to talk with Ms. Gray.  You know, I am

11  not against making an inquiry and giving, you know, the

12  best information she has.  And, you know, that's

13  something -- I would just note, your Honor, that I

14  believe Mr. -- it should be -- Ms. Gray and her daughter

15  were both questioned by Mr.  Scheiner and asked questions

16  and this didn't come up at that point either, in terms of

17  getting information about Mr. Gray, you know, to my

18  knowledge.

19          But notwithstanding that, your Honor, you know,

20  I will contact Mr. Montgomery and Ms. Gray and see if

21  they have updated address and provide it.

22          THE COURT:  Okay.  Is there an objection?

23          MR. SCHEINER:  That should be required.  And if

24  I could just point out that Mr. Gray, his testimony is

25  much more important in light of Ms. King's appearance in

32

Proceedings

1   the case and what she said and the fact that he was the

2   first person from the plaintiff's side to have contact

3   with her.

4            MR. HUESTON:  Your Honor, the characterization

5   of plaintiff's side, Mr. Scheiner is a lawyer enough to

6   understand this language, okay?  He is not on the

7   plaintiff's side.  Okay?  and Mr. Scheiner, you know,

8   your Honor, I do object to that, this sort of conflating

9   of relationships, okay.  That is not a true relationship

10  and I am not going to stand for it, okay?  He is an

11  individual.

12           THE COURT:  Anyway, I heard you the first time,

13  Mr. Hueston.

14           MR. HUESTON:  I'll reach out, your Honor.

15           THE COURT:  Obviously, if there is any action

16  with respect to the estate and he's still administrator

17  of the estate --

18           MR. HUESTON:  That's my -- yes, your Honor.

19           THE COURT:  Okay.

20           MR. HUESTON:  He was the administrator -- we

21  understand that, your Honor, and that's why -- your

22  Honor, I want to just put this in context.  We didn't

23  hear about Mr. Geraud Gray again until literally an hour

24  ago.

25           THE COURT:  Okay.  Well --

33

Proceedings

1    MR. HUESTON:  So it's not like we've had

2    discussions about this.  You know, we told him this

3    information, you know, over a year ago, you know, and now

4    it's come up on the date of this conference.

5         Your Honor, we'll reach out to Ms. Gray, you

6    know, get the best address she has and we'll forward it

7    over to the other side but we don't control him.  We

8    don't make any representation about having him appearing

9    at depositions.

10        MR. SCHEINER:  Your Honor, just to

11   (indiscernible) because the deposition did come up, we

12   did ask Ms. Gray about him and where he is.  The address

13   that she gave us at that time is the same one that we

14   already had.  So, in other words, it didn't work the

15   first time.  So, you know, the question is is there any

16   other -- I mean, there's still --

17        THE COURT:  Mr. Scheiner, you are not without

18   resources to try to locate Mr. Gray and I am asking the

19   plaintiffs to cooperate -- plaintiff's counsel to confer

20   with your clients to see if they can get a better address

21   and/or other contact information.

22        MR. SCHEINER:  Your Honor, we'll do that.

23        THE COURT:  The issue really is whether or not

24   there ought to be an extension of discovery and since I

25   am going to extend discovery to resolve this issue of the

34

Proceedings

1    request to admit, then I will grant an extension within

2    whatever time period we discuss.  I am giving the

3    defendants three weeks to respond to reformulate the

4    request.  So I will extend discovery by four weeks.  And

5    I'll extend discovery for the deposition of Mr. Gray.

6           Now, the other two, I think that nonparty -- I

7    mean, they're both nonparties, obviously.  Ms. King's

8    friend, what are you going to depose her on that Ms. King

9    said she's going to lie?

10          MR. SCHEINER:  I don't know what they talked

11   about, your Honor.  I don't know how it came up, what Ms.

12   King told her happened.  So --

13          THE COURT:  Why don't you ask Ms. King?

14          MR. SCHEINER:  Also, if they talked about the

15   shooting and it ended up at the person referred Ms. King

16   to Geraud Gray.  So it seems to me that she's an

17   important connection between Gray, an executor of the

18   estate and we don't know what was said.  It doesn't have

19   to be a long deposition.  We would certainly try to talk

20   to her first.  We don't know what she would tell us.

21   Without a deposition we want to phrase it (indiscernible)

22   certainly as a strong possibility that it's something

23   that we wanted to do.   (Indiscernible) it's really the

24   same issue that it --

25          THE COURT:  Look, we're going to encounter the

Proceedings

1   same problems here with Mr. Rubenstein.  You know, if Ms.

2   King went to confer with Mr. Rubenstein, are you going to

3   then move to compel Mr. Rubenstein to testify about his

4   conversations with Ms. Gray -- I mean, Ms. King?

5           MR. SCHEINER:  All that said, King did not --

6   King told us she did not go to Mr. Rubenstein to get a

7   lawyer.  There's no suggestion that it happened and Paul

8   -- Paul, I think that she said it wasn't the case.  We

9   asked her who her lawyers were, that came up.

10          THE COURT:  So I am --

11          MR. SCHEINER:  I mean --

12          THE COURT:  -- sorry, why do you want to --

13   it's -- so why do you want to depose Mr. Rubenstein?  Say

14   it again because, you know, you're catching us all by

15   surprise, really, bringing this up and I know Ms. King

16   was only fairly recently deposed but you should have made

17   that determination sooner rather than later to give

18   everybody more than an hour's notice about this.

19          Why don't you confer and you'll put it in

20   writing.  I'm already behind.  I will permit the

21   deposition.  I will extend discovery by four weeks.  So

22   the plaintiff needs to reformulate responses within a

23   week and the defendant's response will be due within

24   three weeks.  So discovery is extended to April 27th.

25   And I'll permit the deposition of Mr. Gray.  You'll

36

                    Proceedings

1  confer on the other two witnesses so I can get a better

2  handle on what -- I'll get some facts on whether or not

3  it makes sense to depose these people.  And we'll set a

4  conference for the April 28th.

5         MR. HUESTON:  That's fine with me, your Honor.

6  Mike Hueston.

7         THE COURT:  Okay.  At 11 o'clock?

8         MR. HUESTON:  That works.

9         MR. SCHEINER:  Is that by phone, your Honor?

10        THE COURT:  I was going to have it in person

11  but is the City planning to make a motion?  I doubt it.

12  I assume not.

13        MR. SCHEINER:  Did you say a dispositive motion

14  or a discovery motion?

15        THE COURT:  A dispositive motion.  I hope this

16  to be the end of discovery.

17        MR. SCHEINER:  Well, your Honor, the --

18        THE COURT:  Fact discovery.

19        MR. SCHEINER:  -- the dispositive motion, this

20  is Alan Scheiner, it wouldn't be on the basis that

21  there's no factual dispute about the shooting.  There is

22  a factual dispute that the shooting, given Ms. King's

23  testimony.  Our arguments about Mr. Fraser really fall by

24  the wayside until trial since the plaintiffs have another

25  leg to stand on for that.

Proceedings

1            I'm not a hundred percent sure there are not

2    other issues that could be the subject of dispositive

3    motions but maybe not.  You know, that's something that

4    we have to think about.

5            THE COURT:  Okay.  Well, come in person and

6    we'll see where you are.

7            MR. HUESTON:  Understood, your Honor.

8            THE COURT:  All right.

9            MR. JOHNSON:  Thank you.

10           THE COURT:  So anyway, obviously if there are

11   going to be more discovery motions, I will expect them to

12   be filed sooner rather than later and I actually don't

13   give us enough time since -- here, let me push the

14   conference to May.  So that there will be a week between

15   the close of discovery and the -- our next conference.

16   So May 4th?  Is that good?

17           MR. HUESTON:  May 4th is fine with me, your

18   Honor.

19           MR. JOHNSON:  Fine with me, your Honor.

20           MR. SCHEINER:  Yes, your Honor.

21           THE COURT:  Okay.  May 4th at 11.  Okay.

22           MR. HUESTON:  Thank you, your Honor.

23           THE COURT:  All right.  Now I am going to my

24   next conference.

25           MR. JOHNSON:  Thank you.

38

Proceedings

1          MR. HUESTON:  Thank you, your Honor.

2          THE COURT:  All right.  Bye.

3          MR. SCHEINER:  Thank you, your Honor.

4                    (Matter concluded)

5                       -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **5th** day of **April**, 2016.

*Linda Ferrara*

Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.